UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

—————

HUGO LOAIZA RODRIGUEZ,

                 Petitioner,                   Case No. 1:12-cv-159

v.                                         Honorable Paul L. Maloney

CAROL HOWES,

                 Respondent.

_____/

**OPINION**

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. On May 4, 2007, a Muskegon County Circuit Court jury convicted Petitioner of one offense: conspiracy to deliver at least 450 but less than 1000 grams of a mixture containing cocaine in violation of MICH. COMP. LAWS §§ 333.7401(2)(a)(ii) and 750.157a. Following the selection of the jury, on the first day of Petitioner's trial, Petitioner pleaded guilty to two offenses: possession with intent to deliver 50 grams or more, but less than 450 grams, of a mixture containing cocaine in violation of MICH. COMP. LAWS § 333.7401(2)(a)(iii); and delivery of less than 50 grams of a mixture containing cocaine in violation of MICH. COMP. LAWS § 333.7401(2)(a)(iv). On June 5, 2007, the trial court sentenced Petitioner as an habitual offender, third offense, MICH. COMP. LAWS § 769.11, to concurrent sentences of 25 years to 60 years on the conspiracy conviction, 10 years to 40 years on the possession with intent to deliver conviction, and 10 years to 40 years on the delivery conviction.

        In his *pro se* petition (ECF No. 1) Petitioner raises eight grounds for relief:

I.      Did prosecutorial misconduct deprive Defendant of a fair trial before a fair and impartial jury where the prosecutor vouched for witnesses by placing the prestige of the government behind them, and made statements of fact before the jury that were unsupported by the evidence and calculated to prejudice the jury against the defendant in violation of the U.S. Const. Ams. VI, & XIV; Mich. Const. 1963 Art. 1, § 20?

    A.      Did the prosecutor's reference to how the state picked its witnesses bolstered [sic] the credibility and placed [sic] the prestige of the government behind the jurors?

    B.      Did the prosecutor's repeated inclusion of facts not in evidence in his arguments to the jury denied [sic] the Defendant his due process right to a fair trial and his constitutional right to a fair and impartial jury?

    C.      Did trial counsel's ineffectiveness deprive the Defendant of a fair trial, where counsel failed to object to the prosecution's misconduct or misdeeds?

II.     Should the Defendant be permitted to withdraw his guilty plea to counts II and III, where the plea was not a knowing and understanding plea, and where the Defendant would not have pled guilty but for trial counsel's ineffectiveness in violation of the U.S. Const. Ams. VI, & XIV; Mich. Const. 1963 Art. 1, § 17?

III.    Did ineffective assistance of trial counsel deprive Defendant of due process of law and a fair trial in violation of the U.S. Const. Ams. VI, & XIV; Mich. Const. 1963 Art. 1, § 17?

IV.     Based solely upon the facts of the instant case, does Defendant's conviction for conspiracy to deliver a controlled substance violate the double jeopardy provisions of the state and federal constitutions and require a new trial, or re-sentencing in accodance [sic] with the U.S. Const. Ams. V, & XIV; Mich. Const. 1963 Art. 1, § 15?

V.      Under the circumstances of this case, does the introduction of James Heister's preliminary examination testimony deprive Defendant of his constitutional right to confront the witnesses against him and a fair trial in violation of the U.S. Const. Ams. VI, & XIV; Mich. Const. 1963 Art. 1, § 20?

VI.    Should a new trial be granted where the cumulative error(s) deprived the Defendant of due process of law, and a fair trial, in violation of the U.S. Const. Am. XIV; and Mich. Const. 1963 Art. 1, §§ 17, & 20?

VII.    Was Defendant's right to effective assistance of counsel on direct appeal violated, by appellate counsel's:

A.    Causing an issue to be lost, by failing to correctly argue a preserved sentencing guidelines error; and,

B.    Failure to raise the issues raised in the instant motion for relief from judgment in violation of the U.S. Const. Ams. VI, & XIV?

VIII.    Is reversal of Defendant's conviction required where the trial court abused its discretion by denying a jury request for the readback of testimony, in violation of the U.S. Const. Ams. VI & XI V; and Mich. Const. 1963 Art. 1, §§ 2, 17, & 20?

(ECF No. 1.)  Respondent has filed an answer to the petition (ECF No. 7) and submitted the state-court record (ECF Nos. 8-27) as required under Rule 5, RULES GOVERNING §2254 CASES.  Upon review of the pleadings and the record, the Court will deny the petition for failure to raise a meritorious federal claim.

## Procedural History

### A.    Trial Court Proceedings

Petitioner's trial spanned four days during May of 2007.  He was charged with three crimes: conspiracy to deliver over 1,000 grams of cocaine, possession with intent to deliver 50 or more grams but less than 450 grams of cocaine, and delivery of less than 50 grams of cocaine.  (Trial Tr. I, ECF No. 16, p. 11.)[1]  After the jury was selected, initially instructed, and released for the day, Petitioner

[1]The Rule 5 materials submitted by Respondent include several transcripts that shall be referenced herein as follows:

| | |
|---|---|
| July 11, 2006 Preliminary Examination Hearing | (Prelim. Exam. Tr., ECF No. 10, p. __) |
| January 9, 2007 Pretrial Hearing rejecting plea offer | (Pretrial Hr'g Tr. I, ECF No. 12, p. __) |
| January 17, 2007 Pretrial Hearing motion to withdraw | (Pretrial Hr'g Tr. II, ECF No. 13, p. __) |
| May 1, 2007 Plea Hearing | (Plea Hr'g Tr., ECF No. 15, p. __) |
| May 1, 2007 Trial Transcript  (Volume 1) | (Trial Tr. I, ECF No. 16, p. __) |

indicated that he wanted to plead guilty to the possession and delivery counts and to being a habitual offender, third offense, but not the conspiracy count.  (Plea Hr'g Tr., ECF No. 15, p. 3.)  The prosecutor had not offered any plea agreement,[2] no promises were made to Petitioner, and Petitioner's counsel had advised against it.  (*Id*.)  Petitioner proffered one reason for his guilty plea: he did not want to lie during the trial.  (*Id*. at p. 5.)

The court explained all the rights Petitioner would be giving up with respect to the two charges.  (*Id*. at pp. 10-11.)  The court also explained that Petitioner's guilty plea might affect the remaining charge of conspiracy in that the statements he made during his plea might be used against him in the conspiracy trial.  (*Id*. at p. 5.)  The court informed Petitioner of the likely range of sentences on the charges to which he was pleading guilty.  (*Id*. at pp. 5-10.)  Petitioner insisted on pleading guilty despite the trial court's warnings.  (*Id*. at p. 11.)

In response to the court's questions, Petitioner admitted that between February 1, 2006, and June 27, 2006, in Muskegon County, he knowingly possessed more than 50 grams, but less than 450 grams, of cocaine with the intent to deliver it to someone else.  (*Id*. at pp. 12-13.)  Petitioner also admitted that on June 27, 2006, he delivered cocaine to Larry Girard in exchange for $250.00.  (*Id*. at pp. 13-15.)

---

May 2, 2007 Trial Transcript  (Volume 2)        (Trial Tr. II, ECF No. 17, p. __)
May 3, 2007 Trial Transcript  (Volume 3)        (Trial Tr. III, ECF No. 18, p. __)
May 4, 2007 Trial Transcript  (Volume 4)        (Trial Tr. IV, ECF No. 19, p. __)
June 5, 2007 Sentencing Transcript              (Sentencing Tr., ECF No. 20, p. __).

[2]Although Petitioner's decision to plead guilty after the jury was selected was not prompted by a plea offer from the prosecutor, at least one such offer had been made and rejected months earlier.  The prosecutor offered a maximum minimum sentence of 22 years in exchange for Petitioner's guilty plea on all three charges. (Pretrial Hr'g Tr. I, ECF No. 12, p. 3.)

The court concluded that Petitioner's plea was understanding, voluntary, and accurate; the court accepted the plea. (*Id*. at p. 16.)

Trial on the conspiracy charge began the next day. The evidence of Petitioner's involvement in the conspiracy to deliver cocaine centered on four controlled cocaine purchases arranged by the West Michigan Enforcement Team ("WEMET"). (Trial Tr. II, ECF No. 17, pp. 80-92, 100-112.) The actual "buys" were accomplished by confidential informant Larry Girard. (*Id*. at p. 61.) Mr. Girard was motivated in part by compensation, but primarily by a desire to remove Petitioner and his drugs from the home where his nephews lived. (*Id*. at pp. 59-60.) Mr. Girard's brother and Petitioner's girlfriend, Tracy Fitch, had three sons from a prior relationship. (*Id*.) The boys lived with Ms. Fitch and Petitioner. (*Id*.)

The first buy occurred on June 6, 2006. (*Id*. at p. 85.) Mr. Girard went to the home of Petitioner and Ms. Fitch. (*Id*. at p. 86.) Ms. Fitch called Petitioner from the home. (*Id*.) Petitioner arrived at the home moments later as a passenger in a white truck. (*Id*.) Shortly thereafter a blue minivan arrived driven by James Hiester. (*Id*.) Mr. Hiester gave Petitioner one ounce of cocaine. (*Id*. at p. 64.) Petitioner gave it to Mr. Girard. (*Id*.) Mr. Girard gave Petitioner the agreed upon price: $500.00. (*Id*.)

The second buy occurred later in June. (*Id*. at p. 66.) At that time, Petitioner was in jail on a minor traffic offense. (*Id*. at p. 90.) When Mr. Girard arrived at Petitioner's home, Ms. Fitch informed him that she was running things for Petitioner while he was in jail. (*Id*. at p. 68.) She contacted Mr. Hiester. (*Id*.) He arrived moments later. (*Id*.) Ms. Fitch then provided Mr. Girard the cocaine in exchange for $500.00. (*Id*. at p. 69.)

The third buy occurred between Mr. Girard and Ms. Fitch as well. (*Id*. at pp. 70-71.) It involved Mr. Girard's payment of $250.00 for one-quarter ounce of uncut cocaine. (*Id*. at pp. 103-04.)

The fourth and final buy involved Petitioner, Ms. Fitch, and Mr. Hiester. Mr. Girard arranged the purchase with Petitioner at Petitioner's home. (*Id*. at p. 72.) Mr. Girard paid Ms. Fitch; she left the home to meet Mr. Hiester at a nearby gas station to get the cocaine from him. (*Id*. at pp. 72-73.) Upon her return, Ms. Fitch gave the cocaine to Petitioner. (*Id*. at p. 73.) Petitioner gave it to Mr. Girard. (*Id*.) Ms. Fitch gave the money to Petitioner. (*Id*.)

After the fourth buy, WEMET executed search warrants at the home of Petitioner and Ms. Fitch as well as the home and garage of Mr. Hiester. (*Id*. at p. 113.) The search at Mr. Hiester's place, which Detective Keith Stratton of WEMET characterized as the "hold house," yielded several plastic bags of cocaine, scales, and wrappings, apparently from larger blocks of cocaine. (*Id*. at pp. 117-30.) At Petitioner's home, WEMET seized two packages of a cutting agent. (*Id*. at pp. 132-34.)

Mr. Hiester was served with a subpoena for trial, but he did not appear at the courthouse. (*Id*. at pp. 93-99.) He simply disappeared. (*Id*.) The trial court permitted the prosecutor to play the recording of Mr. Hiester's preliminary examination testimony at trial.

Mr. Hiester testified that he had picked up and delivered cocaine for Petitioner to make money. (Prelim. Exam. Tr., ECF No. 10, p. 5.) Mr. Hiester indicated that he had traveled with Petitioner and Ms. Fitch to Chicago where they acquired a kilogram of cocaine. (*Id*. at p. 6.) They took the cocaaine to Petitioner's home where they broke it up and cut it with a cutting agent. (*Id*. at pp. 6-7.) They took the cut cocaine to Mr. Hiester's place where they packaged it. (*Id*.) Mr. Hiester held the cocaine at his house until he received delivery instructions from Petitioner. (*Id*. at pp. 7-8.) Mr. Hiester would deliver

the cocaine and, sometimes, collect the money and return it to Petitioner. (*Id*. at pp. 8-12.)  The group planned to use the cocaine in their possession at the time of their arrests to fund another trip to Chicago and acquisition of another kilogram of cocaine.  (*Id*. at pp. 12-13.)  Tracy Fitch testified consistently with Jim Hiester's testimony (Trial Tr. III, ECF No. 18, pp. 22-78.)

The jury also heard from Petitioner.  They heard the statements he had made in an interview with WEMET Detective Lieutenant Cameron Henke (Trial Tr. II, ECF No. 17, pp. 149-61), the statements he had made to his cellmate Christopher Atkinson (pp. 86-97), and Petitioner's testimony (*Id*. at pp. 115-54).[3]

Petitioner testified that he purchased five ounces of cocaine near Rothbury, Michigan.  (*Id*. at p. 132.)  The prosecutor asked Petitioner several questions with regard to that cocaine.  Petitioner acknowledged that Mr. Hiester was holding that cocaine for him.  (*Id*. at p. 133.)  He acknowledged that Ms. Fitch directed Mr. Hiester to come to Petitioner's house with a portion of that cocaine.  (*Id*.)  Petitioner acknowledged that he and Ms. Fitch had an understanding that if Mr. Girard called to buy Petitioner's cocaine, it was okay for Ms. Fitch to sell it to Mr. Girard.  (*Id*. at pp. 133-34.)  He acknowledged that Mr. Girard had come over the day before the final buy seeking cocaine.  (*Id*. at pp. 134-35.) Petitioner admitted he told Mr. Girard that Mr. Girard would have to wait because the "cook" (cutting the cocaine) was screwed up.  (*Id*. at p. 135.)  He acknowledged Ms. Fitch had sold the cocaine to Mr. Girard the next day and that he got at least a significant part of the money.  (*Id*.)  Petitioner specifically admitted that he was involved in a conspiracy to deliver cocaine on that day.  (*Id*. at p. 136.)

---

[3]Petitioner testified despite his counsel's urging to remain silent.  (Trial Tr. III, ECF No. 18, pp. 111-12.)

In addition to the Girard transaction, Petitioner admitted that he had directed Tracy to deliver additional ounces of cocaine to another friend that day.  (*Id*.)

The prosecutor reviewed the first buy with Petitioner (*Id*. at pp. 138-39.)  Petitioner acknowledged his role.  The prosecutor reviewed Petitioner's role in directing the initial cut of the ounces from Rothbury and then Petitioner's directing of the recut to increase the yield.  (*Id*. at pp. 139-40.) Apparently in an attempt to avoid connecting himself to the kilogram quantity that Mr. Hiester and Ms. Fitch testified about, Petitioner testified that the cocaine from the first buy came from Grand Rapids.  (*Id*. at pp. 142-44.)  He stated that he purchased three ounces and then cut it to six ounces.  (*Id*.)

Through his own testimony, Petitioner admitted that he participated in a conspiracy to deliver at least twenty ounces of cocaine that he owned.[4]  He also contended that additional cocaine was delivered that belonged to Mr. Hiester.  Petitioner's testimony, standing alone, fully supported the jury's verdict that he was guilty of conspiracy to deliver at least 450 but less than 1000 grams of cocaine. Petitioner was sentenced on the conspiracy, based on the jury verdict, and the possession and delivery, based on his plea, to the terms of imprisonment set forth above.

### B.    Direct Appeal

Petitioner filed a claim of appeal in the Michigan Court of Appeals.  His brief, filed by counsel, raised five issues, none of which are part of his habeas petition.  The court of appeals rejected each of Petitioner's claims of error and affirmed the trial court by unpublished opinion dated November 20, 2008.  (Mich. Ct. of App. Op., ECF No. 21.)

---

[4]The post-cut amount of 14 ounces from the Rothbury buy and the post-cut amount of 6 ounces from the Grand Rapids buy.  Each ounce contains just over 28 grams; thus, Petitioner's twenty ounces would equal more than 560 grams.

Petitioner filed a pro per application for leave to appeal in the Michigan Supreme Court. That court denied leave by order entered May 27, 2009. (Mich. Ord., ECF No. 22.)

### C.   Motion for Relief from Judgment

On March 24, 2010, Petitioner filed a pro per motion for relief from judgment in the Muskegon County Circuit Court. (Mot. for Relief from J., ECF No. 23; Mot. to Suppl. Mot. for Relief from J., ECF No. 24.) Petitioner raised the same issues in that motion that he raises here. (*Id*.) With respect to all of the issues, the court determined that Petitioner could have raised them in his direct appeal, but failed to do so. (Op. and Order, ECF No. 25, pp. 1-2.) With respect to seven of the eight issues (Issues I, II, III, V, VI, VII and VIII), the court concluded Petitioner was not entitled to relief because he had failed to show good cause for the failure to raise them previously or resulting prejudice. (Op. and Order, ECF No. 25, pp. 1-2.) The remaining issue was jurisdictional; the court rejected that issue on the merits. (*Id*.) Petitioner sought leave to appeal in the Michigan Court of Appeals and the Michigan Supreme Court. Both courts denied leave to appeal under M.C.R. 6.508(D), on March 24, 2011, and January 30, 2012, respectively. (*See* Mich. Ct. App. Ord., ECF No. 26; Mich. Ord. ECF No. 27.)

Petitioner commenced this action by filing a pro per petition during February of 2012.

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An

application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S.

at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

### Discussion

### A.    Prosecutorial misconduct

Misconduct by a prosecutor can rise to the level of a due process violation. *Lundy v. Campbell*, 888 F.2d 467, 474 (6th Cir. 1989). However, before habeas corpus relief becomes available, the misconduct must be so egregious as to deny petitioner a fundamentally fair trial. *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993). The habeas court must consider the extent to

which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated

or extensive, and whether the claimed misconduct was deliberate or accidental.  *See United States v.*

*Young*, 470 U.S. 1, 11-12 (1985).  In addition, the court may view any misconduct in light of the strength

of the competent proofs tending to establish guilt.  *See Angel v. Overburg*, 682 F.2d 605, 608 (6th Cir.

1982) (en banc).  "When a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due

process analysis . . . is the fairness of the trial, not the culpability of the prosecutor.'"  *Serra*, 4 F.3d at

1355 (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).

      "Claims of prosecutorial misconduct are reviewed deferentially on habeas review."

*Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512

(6th Cir. 2003)).  Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial

breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in

prosecutorial misconduct cases] is necessarily imprecise.'"  *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir.

2006) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974)).  Thus, in order to obtain habeas

relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection

of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood

and comprehended in existing law beyond any possibility for fairminded disagreement."  *Parker v.*

*Matthews*, 132 S. Ct. 2148, 2155 (2012) (internal quotation omitted).

### 1.      Vouching

      Petitioner believes that the prosecutor engaged in improper "vouching" for its witnesses.

The Sixth Circuit has generally recognized two types of objectionable vouching.  *See Johnson v. Bell*, 525

F.3d 466, 482 (6th Cir. 2008); *Brown v. McKee*, 231 F. App'x 469, 478 (6th Cir. 2007) (citing *United*

*States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)); *but see  Wogenstahl v. Mitchell*, 668 F.3d 307, 328-29 (6th Cir. 2012) (treating the two aspects of vouching as part of a single standard).[5]  The first type impermissibly places the government's prestige behind the witness to bolster the witness' credibility. *Francis*, 170 F.3d at 550; *United States v. Carroll*, 26 F.3d 1380, 1388-89 (6th Cir. 1994); *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir. 1992).  In the second type of impermissible vouching, also known as bolstering, the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt. *See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965); *Henderson v. United States*, 218 F.2d 14, 19 (6th Cir. 1955).                     Neither type of objectionable vouching is involved in this case.  Indeed, the prosecutor's statements that Petitioner claims constitute vouching are really not vouching at all.  In the prosecutor's prefatory comments during voir dire, he explained to the jury different ways that the state could prove things beyond a reasonable doubt.  (Trial Tr. I, ECF No. 16, pp. 21-23.)  One way, the prosecutor elaborated, is through witness testimony:

> [T]hey can also do that in other ways.  I saw him with it.  A witness testifies.  I saw, I touched, I heard, I tasted.  The five senses.  A witness testifies they personally observed the defendant with that cocaine.  That's another way to prove it.

---

[5]Notwithstanding the Sixth Circuit's continuing application of its own precedent on vouching, *see Wogenstahl*, 668 F.3d at 328 29 (citing *Johnson v. Bell*, 525 F.2d 466, 482 (6th Cir. 2008)), the Supreme Court has not directly held that vouching amounts to prosecutorial misconduct.  Given the Supreme Court's recent admonitions to the courts regarding the limits of clearly established general principles, it is doubtful that vouching has been clearly established by the Supreme Court as a due process violation.  *See, e.g., Lopez v. Smith*, 135 S. Ct. 1, 3 (2014) (holding, with respect to a claim of self-representation, that "[c]ircuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.'") (quoting *Marshal v. Rodgers*, 133 S. Ct. 1446, 1450 (2013); *White v. Woodall,* 134 S. Ct. 1697, 1703 (2014) (same, respecting a claim regarding the privilege against self-incrimination); *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) ("The highly generalized standard for evaluating claims of prosecutorial misconduct set forth in *Darden* bears scant resemblance to the elaborate, multistep test employed by the Sixth Circuit here.").

(Id. at p. 22.) Petitioner contends the prosecutor leapt from that innocuous remark to the following objectionable one: "Do you understand that the People of the State of Michigan picked their witnesses from those who saw, touched, heard, the personal knowledge [sic]. Anybody have a problem with that?" (*Id.* at pp. 36-37.) Petitioner implies that the prosecutor vouched for the prosecution's witnesses by claiming they had first-hand knowledge. The comment is not objectionable on its face. Apparently, Petitioner contends the prosecutor was claiming the state's witnesses were superior because they had firsthand knowledge, and by negative implication the defense witnesses did not.

Petitioner takes the comment completely out of context. In the preceding sentence, the prosecutor states: "Is there anybody who feels just because somebody is involved in the drug trade and gets on the witness stand and promises to tell the truth and gives evidence that they're not believable or they're not credible because they were involved with drugs?" (*Id.* at p. 36.) The prosecutor was explaining that the state was not entitled to just pick and choose its witnesses. It was stuck with the people who saw, touched, heard, and had personal knowledge–even if those people were involved in the drug trade. That is hardly placing the prestige of the government behind the state's witnesses; nor does the comment suggest there is more to the evidence than that which will be actually introduced at trial. Thus, the trial court's conclusion that this was "not vouching" but "merely a reference to the type of evidence that would be offered" (Op. and Order, ECF No. 25, p. 3) is not unreasonable; it is also not inconsistent with or contrary to clearly established federal law.

### 2.    Cumulative effect of several prosecutorial comments

Petitioner next contends that the prosecutor rendered his trial unfair by arguing facts not in evidence, suggesting that a significant quantity of additional cocaine would have come into Muskegon

County if Petitioner had been permitted to continue, casting Petitioner as dangerous, and improperly

focusing on Petitioner's ethnicity.   The trial court rejected Petitioner's claims:

> Next the Defendant challenges the Prosecutor's statements in opening and closing arguments. He cites the opening argument that an informant witness exposed himself to potential harm by buying cocaine from individuals in a distribution network that delivered kilos. Defendant claims that here was no evidence that he was a member of a network which would have endangered the informant. The Prosecutor did not say that Defendant was part of a network that enndagered the informant. He said the Defendant was in a network that delivered kilos. The testimony of James Heister [sic] and Tracy Fitch provided support for that argument. Moreover, Ms. Fitch also testified that she was surprised that she wasn't shot when she walked up to a van in which the Defendant was consummating a cocaine deal. TT day3 p 36.

> It is a fair inference that people who deal with a conspiratorial drug operation are exposed to danger. In addition, Detective Stratton testified about safety concerns when a drug deal is consummated. TT Day 2 pp 81, 86. He also described how police officers wear bullet-proof vests when conducting a search of a residence for drugs. *Id* p 113. There was ample evidence to support the argument that these are dangerous activities. If another reviewing court should conclude otherwise, it should be noted that a cautionary instruction was provided to the jury on two separate occasions to disregard attorneys' arguments that are not supported by the evidence. Trial transcript pp 14, 15, 176; *See, People v Dobek,* 274 Mich App 58, 213 NW2d 97 (2007).

> The Defendant finds error in the Prosecutor's argument that defendant was going to continue dealing cocaine after he was released from jail and they were delivering kilos. TT Day 2 p 27. He also finds fault in the Prosecutor noting that the defendant was Mexican and asking if he speaks Spanish. The matter of Defendant's ethnic background was known to the jury before the Prosecutor asked the question that Defendant cites. His name suggests a Spanish heritage. Furthermore, when scrutinized in context, this information was relevant. Exhibit 47 was an exhibit that Defendant acknowledged to have authored. Id. p 152. This document contains writing in Spanish. It was relevant to establish the Defendant's literacy in Spanish to qualify him to translate the content of Exhibit 48 to the jury. There is no error here.

> There was support in the record for the Prosecutor's argument that Defendant was going to continue to deal cocaine after his release from jail. Tracy Fitch testified that she knew the Defendant was going to buy more cocaine after his release. In fact, she stated that he purchased five ounces after his release and a coconspirator delivered this to her.

TT Day 3 pp 23-26.  There was testimony that Defendant and his coconspirators dealt with at least two kilos of cocaine.  *Id.* pp 46-47.

(Op. and Ord., ECF No. 25, pp. 4-5.)  This Court must presume the trial court's factual determinations are correct.  Petitioner can overcome that presumption with clear and convincing evidence.  He offers no such evidence here.  The state court's determination of the facts was certainly not unreasonable.  Moreover, Petitioner has failed to demonstrate that the state court's determination was contrary to or an unreasonable application of clearly established federal law.

### B.     Unknowing plea because of ineffective counsel

It has long been the case that a valid guilty plea bars habeas review of most non-jurisdictional claims alleging antecedent violations of constitutional rights.  *See Tollett v. Henderson*, 411 U.S. 258, 267 (1973).  Among claims not barred are those that challenge "the very power of the State to bring the defendant into court to answer the charge against him," *Blackledge v. Perry*, 417 U.S. 21, 30 (1974), and those that challenge the validity of the guilty plea itself.  *See Hill v. Lockhart*, 474 U.S. 52, 58 (1985);  *Haring v. Prosise*, 462 U.S. 306, 320 (1983);  *Tollett*, 411 U.S. at 267.  A plea not voluntarily and intelligently made has been obtained in violation of due process and is void.  *See McCarthy v. United States*, 394 U.S. 459, 466 (1969).  Petitioner's claim does not challenge the power of the state to bring him into court.  Thus, the only means available for challenging his conviction is to claim that his plea is invalid, i.e., it was not knowingly and voluntarily entered into.  *See Mabry v. Johnson*, 467 U.S. 504, 508 (1984) ("It is well-settled that a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked.").

The test for determining a guilty plea's validity is "'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). Courts assessing whether a defendant's plea is valid look to "all of the relevant circumstances surrounding it," *Brady v. United States*, 397 U.S. 742, 749 (1970), and may consider such factors as whether there is evidence of factual guilt. While courts may consider whether a factual basis for a guilty plea exists in their assessments of its validity, it has generally been held that the Constitution does not require that they ensure such a basis exists. *See Alford*, 400 U.S. at 31 ("Strong evidence of guilt may suffice to sustain a conviction on an *Alford* plea, and may be essential under FED. R. CRIM. P. 11, but it is not necessary to comply with the Constitution."); *see also Matthew v. Johnson*, 201 F.3d 353, 365 (5th Cir. 2000); *Wallace v. Turner*, 695 F.2d 545, 548 (11th Cir. 1983); *Thundershield v. Solem*, 565 F.2d 1018 (8th Cir.1977); *Edwards v. Garrison*, 529 F.2d 1374, 1376 (4th Cir.1975); *Roddy v. Black*, 516 F.2d 1380, 1385 (6th Cir. 1975); *Freeman v. Page*, 443 F.2d 493, 497 (10th Cir. 1971).

The defendant pleading guilty must be competent, *see Brady*, 397 U.S. at 756, and must have notice of the nature of the charges against him, *see Henderson v. Morgan*, 426 U.S. 637, 645 n.13 (1976); *Smith v. O'Grady*, 312 U.S. 329, 334 (1941). The plea must be entered "voluntarily," i.e., not be the product of "actual or threatened physical harm, or . . . mental coercion overbearing the will of the defendant" or of state- induced emotions so intense that the defendant was rendered unable to weigh rationally his options with the help of counsel. *Brady*, 397 U.S. at 750; *Machibroda v. United States*, 368 U.S. 487, 493 (1962) ("A guilty plea, if induced by promises or threats which deprive it of the character of a voluntary act, is void."). The defendant must also understand the consequences of his plea,

including the nature of the constitutional protection he is waiving. *Henderson*, 426 U.S. at 645 n.13; *Brady*, 397 U.S. at 755; *Machibroda*, 368 U.S. at 493 ("Out of just consideration for persons accused of crime, courts are careful that a plea of guilty shall not be accepted unless made voluntarily after proper advice and with full understanding of the consequences.") (internal quotations and citation omitted). Finally, the defendant must have available the advice of competent counsel. *Tollett*, 411 U.S. at 267-68; *Brady*, 397 U.S. at 756; *McMann v. Richardson*, 397 U.S. 759, 771 & n.14 (1970). The advice of competent counsel exists as a safeguard to ensure that pleas are voluntarily and intelligently made. *Cf. Henderson*, 426 U.S. at 647 ("[I]t may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit."); *Brady*, 397 U.S. at 754 (suggesting that coercive actions on the part of the state could be dissipated by counsel). Ineffective assistance of counsel will render a plea of guilty involuntary. *See Hill*, 474 U.S. at 56-57.

Petitioner contends that his plea was unknowing and involuntary because he was denied the effective assistance of counsel. Petitioner, by way of affidavit (Aff. Of Hugo Loaiza Rodriguez, ECF No. 23) and argument (Pet., ECF No. 1, PageID.31-35), identifies several instances of ineffective assistance that he claims relate to his plea on the delivery and possession with intent to deliver counts. In evaluating his claims, it is important to keep in mind that his counsel advised against making the plea.

### 1.    Cocaine weights

One instance of ineffective assistance was counsel's alleged failure to advise Petitioner that "that the weights [of cocaine] from different cases would be combined[.]" (*Id.* at PageID.34.) The Court has been unable to locate any circumstance in the trial court or appellate record where weights of cocaine

were combined to Petitioner's detriment. The issue of cocaine weights, however, appeared to vex Petitioner throughout the proceedings. (*See, i.e.*, Sentencing Tr., ECF No. 20, p. 7 ("I'm very confused how do they put together on crimes and put it at - put it to make more than 450 [grams] and less than 999 [grams]. I really very confusing there. Can they do that?")) It appears Petitioner believed that by pleading guilty to the possession with intent to deliver more than 50 grams but less than 450 grams of cocaine charge and the delivery of less than 50 grams of cocaine charge that he would effectively subtract those weights from the total amount of cocaine under consideration on the conspiracy charge.[6] That might explain his willingness, despite the contrary advice of counsel, to plead guilty and then at the conspiracy trial admit under oath to involvement with significant quantities of cocaine. Petitioner offers nothing to suggest that his counsel, the prosecutor, or the court, misled him with respect to the determination of cocaine weights for any of the charges. Indeed, the trial court expressly stated that his admissions with respect to delivery and possession would be used to convict him of the more serious charge of conspiracy. (Plea Tr., ECF No. 15, p. 5.)

Under settled Sixth Circuit authority, petitioner's responses to the trial judge, given under oath at the plea hearing, preclude a subsequent assertion that some other unannounced benefit prompted the plea of guilty. In *Baker v. United States*, 781 F.2d 85 (6th Cir. 1986), the trial court inquired concerning the terms of any plea bargain, received a response from the prosecutor on the record, and received denials from defense counsel, the prosecutor, and the defendant concerning the existence of any other terms. The Sixth Circuit held that where the trial court has scrupulously followed the required

---

[6]"[T]rial counsel performed ineffectively by . . . failing to inform Defendant of the possibility that the amounts of cocaine involved in separate charges that defendant pleaded guilty to could be combined for the purposes of establishing a conspiracy to deliver a larger weight of cocaine." (Mot. for Relief from J., ECF No. 23, p. 18.)

- 19 -

procedure, "the defendant is bound by his statements in response to that court's inquiry." 781 F.2d at 90

(quoting *Moore v. Estelle*, 526 F.2d 690, 696-97 (5th Cir. 1976)). The Sixth Circuit, noting the obvious,

observed that a trial judge cannot possibly administer a plea agreement, if it consists of "secret terms known

only to the parties." *Id.* at 90. Furthermore, because defendant's later claim of a secret agreement was

negated by the trial record, no evidentiary hearing was required. *Id.* at 92. The court again addressed this

issue in *Warner v. United States*, 975 F.2d 1207 (6th Cir. 1992), and *United States v. Todaro*, 982

F.2d 1025 (6th Cir. 1993), also section 2255 cases. In *Todaro*, the defendant attempted to attack his

guilty plea, claiming that his attorney had promised him that he would be sentenced to probation if he pled

guilty. The defendant had testified at the plea colloquy, however, that no other promises had been made

to him, other than those stated in the plea agreement. 982 F.2d at 1026. Consequently, the Sixth Circuit

was again faced with a situation in which a defendant's post-conviction allegations were directly contrary

to his statements at the plea hearing. Relying on *Baker*, the court reiterated its earlier holding, under which

a defendant is bound by his statements in response to the trial court's inquiry, where there has been a

careful plea colloquy. In *Warner*, the Sixth Circuit likewise rejected claims of unannounced promises in

the face of defendant's flat denial of promises at the plea, holding that the petitioner's statements

"estopped" him from relying on undisclosed promises. 975 F.2d at 1210.[7] *See also Ramos v. Rogers*,

170 F.3d 560, 565 (6th Cir. 1999) (concluding that "a claim of ineffective assistance of counsel predicated

---

[7] Thereafter, the court in *Peavy v. United States*, 31 F.3d 1341 (6th Cir. 1994), ordered an evidentiary hearing to inquire into allegations of an undisclosed plea agreement. The *Peavy* court noted that the government admitted the existence of an oral plea agreement, not reflected at the plea hearing. The court was careful to observe that the trial court had not directly asked the defendant whether there were any promises apart from the plea agreement. "Such inquiries would have prompted disclosure of the promises on which Peavy relies here, or, if Peavy had remained silent, likely would foreclose his post-conviction reliance on [those] promises." 31 F.3d at 1345.

on allegedly misleading information given by counsel about the terms of a plea agreement can never constitute an 'extraordinary circumstance' under *Baker* when the court conducts a proper, clear, and thorough plea colloquy").

The same reasoning precludes Petitioner's challenge regarding the cocaine weights. Petitioner's case presented the unusual circumstance where there was no plea agreement. There was no apparent benefit to Petitioner. His own counsel advised against it. So the trial court carefully questioned Petitioner with respect to any promised benefit that prompted his plea. Petitioner disclaimed any such benefit. (Plea Hr'g Tr., ECF No. 15, p. 4.) Petitioner also denied the existence of any force coercing him to make the plea. (*Id.*) The court reviewed, and Petitioner acknowledged, the charges and the penalties, including the possibility of life imprisonment. The court reviewed, and Petitioner acknowledged, each right he was waiving by pleading guilty. Finally, the trial court made clear that his admissions with respect to the delivery and possession with intent to deliver counts could be used against him in the trial on the conspiracy count. (Plea Hr'g Tr., ECF No. 15, pp. 4-5.)

Petitioner is bound by his responses to the trial court during the plea colloquy. To the extent Petitioner entered the plea proceeding subject to some mistaken belief with regard to the consequences of his plea on the cumulation of cocaine weights, the plea colloquy remedied that problem. *See, e.g., United States v. Horne*, 313 F. App'x 788, 793 (6th Cir. 2008) ("Any mistaken belief Horne may have harbored as a result of misleading information from his counsel at the time of entering the plea was remedied at the plea colloquy. During the plea colloquy, the district court clearly informed Horne of the conditions and consequences of his plea."); *United States v. Contreras-Armendariz*, 107 F. App'x 594, 596-97 (6th Cir. 2006) (where the court "reviewed the rights that Contreras was waiving, the factual

and legal nature of the offenses with which he was charged, and the potential sentences he faced as a result of the guilty plea," the plea was knowing and voluntary despite Contreras' mistaken belief his criminal history category was lower than it was ultimately determined to be); *Adkins v. Lafler*, No. 4:06-CV-11562, 2006 WL 3759921 at *4 (E.D. Mich. December 20, 2006) (concluding that Petitioner's erroneous assumptions and mistaken beliefs were "insufficient to overcome the presumption of verity which attaches to Petitioner's statements during the plea colloquy . . . ."). Accordingly, Petitioner's misunderstanding regarding cocaine weights does not render his plea involuntary or unknowing.

### 2.    Counsel's failure to pursue Petitioner's desired defense strategy

Claims about the deprivation of constitutional rights that occur before the entry of a guilty plea are foreclosed by that plea. *See United States v. Broce*, 488 U.S. 563, 569 (1989); *Tollett*, 411 U.S. at 267. The United States Supreme Court has explained:

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within [constitutional standards].

*Tollett*, 411 U.S. at 267. Consequently, a knowing and voluntary guilty plea waives all nonjurisdictional defects in the proceedings, including a claim of ineffective assistance of counsel that does not relate to the voluntariness of the plea. *See United States v. Stiger*, 20 F. App'x 307, 308–09 (6th Cir. 2001). Petitioner's claims of ineffective assistance from trial counsel that relate to counsel's alleged failure to follow Petitioner's proposed defense strategy do not attack the voluntary or intelligent nature of his plea by showing that counsel's advice was inadequate. Instead, the claims relate to earlier alleged constitutional

deprivations. Such claims have therefore been waived by his subsequent guilty plea. *See Stiger*, 20 F. App'x at 308-09; *see also United States v. Bohn*, 956 F.2d 208, 209 (9th Cir. 1992) (pre-plea ineffective assistance of counsel claims are waived). To the extent the claims carry over to the conspiracy count, however, they are considered below.

### C.    Ineffective assistance of trial counsel generally

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. "When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on

one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

The trial court concluded that Petitioner had procedurally defaulted his general ineffective assistance claim. "If a petitioner does not satisfy the procedural requirements for bringing an error to the state court's attention-whether in trial, appellate, or habeas proceedings, as state law may require-procedural default will bar federal review." *Magwood v. Patterson*, 561 U.S. 320 (2010). Nevertheless, the U.S. Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423 24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Hudson*, 351 F.3d at 215-16; *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

**1.      Petitioner's ability to comprehend English**

Petitioner contends that his difficulty in understanding English worked to his detriment and that his counsel was ineffective for failing to secure an interpreter. There is no controlling authority from the Supreme Court that recognizes a constitutional right to an interpreter; thus, the state court's failure to appoint one cannot be contrary to clearly established federal law and cannot support a grant of habeas relief. *Nguyen v. Booker*, 496 F. App'x 502, 506 (6th Cir. 2012). Moreover, a review of the record reveals many instances where Petitioner communicated directly with the trial court. Those exchanges indicate that Petitioner had an adequate understanding of the English language to communicate and understand the communications of others. Indeed, Petitioner "clearly had sufficient command of English to have requested an interpreter." *Rubio v. Estelle*, 689 F.2d 533, 535 (5th Cir. 1982). Yet there is no indication that Petitioner asked the court or his counsel for an interpreter.

The trial court found Petitioner's argument regarding an interpreter unsupportable:

> His claim of a need for a translator is completely undermined by his dialogue with the Court at several pretrial motions, his plea proceeding, and his in propria persona application for leave to appeal to the [Michigan] Supreme Court as well as the instant motion with 43-page brief he authored with the assistance of a paralegal. In addition, he dialogued quite appropriately with the attorneys while testifying at his trial. He is clearly capable of comprehending and communicating in English.

(Op. and Ord., ECF No. 25, p.6 n.3 (citations to record omitted).) Under those circumstances, where Petitioner projects the appearance of ably understanding English through his participation in court proceedings and never seeks assistance, Petitioner has simply failed to overcome the presumption that counsel's failure to request an interpreter fell within the wide range of reasonable professional assistance.

**2.      Failure to interview Petitioner's proposed witnesses**

Petitioner contends his counsel was ineffective for failing to interview Brian Newell. According to Petitioner's affidavit, "Brian Newell would have testified that he lived across the street from my codefendant, Mr. Heister, for approximately three months, that he had previously been involved in drug deals with me and, separately, with Heister, and that Heister was involved in the purchase and sale of large amounts of cocaine before he (Heister) ever met [Petitioner]." (Aff. of Petitioner, ECF No. 23, p.1.) Petitioner's statement with regard to Mr. Newell's knowledge was accurate, but his conclusions that (1) his attorney failed to interview Mr. Newell and (2) that Mr. Newell would testify, are simply wrong. Petitioner's counsel interviewed Mr. Newell and determined that his testimony related to a time frame prior to the charged conspiracy and, although it would reveal that Mr. Hiester dealt drugs before he met Petitioner, it would also reveal Petitioner sold additional amounts of cocaine to Mr. Newell. (Trial Tr. III, ECF No. 18, pp. 98-99.) Moreover, Mr. Newell said that he would refuse to testify on the ground that his testimony might incriminate him. (*Id*.)

Petitioner also contends that his counsel failed to interview three other witnesses, all inmates in the Muskegon County Jail. Those inmates, according to Petitioner, would have testified that Petitioner was not sociable with jailhouse snitch Christopher Atkinson, did not befriend Atkinson, and did not discuss Petitioner's case with Atkinson. (Aff. of Petitioner, ECF No. 23, pp. 1-2.) The value of such testimony would have been minimal, at best, because it would have been inconsistent with Petitioner's recollection of events. Petitioner testified that he *had* discussed his case with Atkinson and that Atkinson had read documents relating to the case to Petitioner. (*Id*. at pp. 115-16.) Petitioner's theory, that Atkinson knew factual details because he read them in Petitioner's papers not because Petitioner had confessed to Atkinson, was apparent from Petitioner's counsel's cross-examination of Atkinson.

- 26 -

Counsel's failures: (1) to dedicate any further effort to refuting the sketchy testimony Atkinson provided during the few minutes he was on the stand (Trial Tr. III, ECF No. 18, pp. 86-97); and (2) to put Mr. Newell on the stand so that the jury would hear him refuse to testify to avoid self-incrimination, bear every appearance of sound trial strategy. Petitioner has not demonstrated that failing to further pursue those witnesses fell outside the wide range of reasonable professional assistance. Petitioner's general ineffective assistance of counsel claim is, therefore, without merit.   **D** .

### Double Jeopardy Clause

Petitioner argues: "the constitutional protections against double jeopardy were violated when the court sentenced the Defendant for two counts of possession with intent to deliver a controlled substance and conspiracy to deliver a controlled substance when the deliveries that the Defendant pleaded guilty were separate transactions, unrelated to one another, and unrelated to the conspiracy to deliver a larger amount of cocaine." (Mot. for Relief from J., ECF No. 23, p. 25.)  In presenting his double jeopardy argument, Petitioner states that it depends on his Confrontation clause challenge.  Because that challenge fails, *see* E. below, his double jeopardy challenge necessarily fails as well.  That was the basis for the trial court's rejection of Petitioner's double jeopardy claim. (*See* Op. and Ord., ECF No. 25, p. 2.)

To the extent Petitioner's double jeopardy claim is based on the impropriety of multiple punishments for delivery and possession, on the one hand, and conspiracy, on the other hand, the claim still fails.  The Double Jeopardy Clause guarantees that no person shall be "subject for the same offense to be twice put in jeopardy of life or limb."  U.S. CONST. amend. V.  This clause protects against multiple punishments for the same offense.  *See North United States v. Dixon*, 509 U.S. 688, 696 (1993); *North*

*Carolina v. Pearce*, 395 U.S. 711, 717 (1969); *Costo v. United States*, 904 F.2d 344 (6th Cir. 1990).

The protection against multiple punishments for the same criminal act "is designed to insure that the

sentencing discretion of courts is confined to the limits established by the legislature." *Ohio v. Johnson*,

467 U.S. 493, 499 (1984).  This guarantee serves principally as a restraint on courts and prosecutors, not

on legislatures.  *See Garrett v. United States*, 471 U.S. 773, 793 (1985) (no double-jeopardy violation

when Congress intended to permit prosecution for continuing criminal enterprise after prior conviction for

predicate offense); *Missouri v. Hunter*, 459 U.S. 359, 365-66 (1983).  Therefore, when determining

whether punishments are "multiple" under this aspect of the Double Jeopardy Clause, the court is bound

by the intent of the legislature.  *Johnson*, 467 U.S. at 499; *Hunter*, 459 U.S. at 366-68.

        In this context, the United States Supreme Court has traditionally applied the "same

elements" test first enunciated in *Blockburger v. United States*, 284 U.S. 299, 304 (1932).  *See Rutledge*

*v. United States*, 517 U.S. 292, 297 (1996).  The same-elements test, also known as the "*Blockburger*

test," inquires whether each offense contains an element not contained in the other.  If "the same act or

transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine

whether there are two offenses or only one is whether each provision requires proof of a fact which the

other does not." *Blockburger*, 284 U.S. at 304.  If not, they are the "same offense" and double jeopardy

bars additional punishment.  *See Brown v. Ohio*, 432 U.S. 161, 168-69 (1977).  If the *Blockburger* test

is satisfied, however, it is presumed that the legislature intended to punish the defendant under both statutes

and there is no double jeopardy bar to multiple punishments.  *Whalen v. United States*, 445 U.S. 684,

691-92 (1980).

"When assessing the intent of a state legislature, a federal court is bound by a state court's construction of that state's own statutes" and "by a state court's determination of the legislature's intent." *Banner v. Davis*, 886 F.2d 777, 780 (6th Cir. 1989) (citing *Hunter*, 459 U.S. at 368; *O'Brien v. Skinner*, 414 U.S. 524, 531 (1974); *Ohio v. Johnson*, 467 U.S. 493 ,499 (1983)).   The Michigan legislature intended separate convictions and punishments for the crime of possession with intent to deliver cocaine and conspiracy to deliver cocaine. *Rodriguez v. Jones*, 325 F. Supp 2d 552, 562 (E.D. Mich. 2009) *aff'd* 478 F. App'x 271 (6th Cir. 2012) (citing *People v. Sammons*, 478 N.W. 2d 901, 913 (Mich. App. 1991) ("[S]eparate convictions and punishment for possession with intent to deliver cocaine and conspiracy to deliver cocaine do not violate double jeopardy protections.")).

That leaves only the delivery and possession counts, the counts for which Petitioner pleaded guilty.   Whether or not the Michigan legislature intended separate convictions and punishments for possession and delivery of the same cocaine is immaterial.   Petitioner claims the transaction at issue in the delivery count was unrelated to the transaction(s) at issue in the possession count[8], thus there can be no Double Jeopardy Clause violation. *See Blockburger*, 284 U.S. at 301-02 (concluding that separate transactions constitute distinct offenses).   Indeed, the *Blockburger* test need only be applied "where *the same act or transaction* constitutes a violation of two distinct statutory provisions . . . ." *Id.* at 304 (emphasis added).   Put simply, no matter what two convictions or punishments are at issue, Petitioner's Double Jeopardy Clause challenge is without merit.

### E.   Confrontation Clause

---

[8]*See* (Mot. for Relief from J., ECF No. 23, p. 26 ("[T]he transactions the Defendant pleaded guilty to . . . were not related to each other . . . .")).

- 29 -

Petitioner contends that he was deprived of his right to confront the witnesses against him when the trial court admitted the preliminary examination testimony of James Hiester. Testimonial out-of-court statements by witnesses are barred under the Confrontation Clause unless witnesses are unavailable and defendants had a prior opportunity to cross-examine witnesses, regardless of whether such statements are deemed reliable by court. *Crawford v. Washington*, 541 U.S. 36 (2004) (abrogating *Ohio v. Roberts*, 448 U.S. 56 (1980)). "The Confrontation Clause guarantees only 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent, the defense might wish.'" *United States v. Owens*, 484 U.S. 554, 559 (1988) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987); *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

At Petitioner's trial, the prosecutor intended to call James Hiester. Mr. Hiester, however, failed to appear for trial. The prosecutor detailed his efforts to procure Mr. Hiester's attendance:

> Your honor, I have had discussions with Sergeant Lewkowski in an attempt to have Mr. Hiester appear for trial. He did not come to the first day of trial. Sergeant Lewkowski informed me that he personally served Mr. Hiester his subpoena for the trial and Mr. Hiester indicated that he would attend. We've been unable to locate Mr. Hiester. We've actually had surveillance on his residence and spoke to a girlfriend who indicated that he had disappeared and in a most unusual thing, left the children behind. So, we have continued to surveil the residence, have attempted to locate him through the telephone numbers that we have for him and we have not received any call backs, although we've left multiple messages for him. We've even gone as far as to issue a search warrant in attempts to locate him and in fact, we're a little concerned. In light of that, because I did have him served personally through Sergeant Lewkowski, I propose that I be allowed to introduce his preliminary examination testimony.

(Trial Tr. II, ECF No. 17, pp. 93-94.) The trial court responded:

> [T]here are two issues then that we have to address. First of all, is this a violation of the confrontation clause. Basically what we're dealing with is the *Crawford* decision by the

U.S. Supreme Court when we're addressing that issue. Now *Crawford* recognized that confrontation is a separate issue from the issue of hearsay although sometimes they get confused. They are separate issues. And you need to overcome both of those hurdles, Mr. Bader, in order to get this material in. *Crawford* did recognize however, that, I think they refer to them as firmly, rooted, recognized exceptions to the requirements of the Sixth Amendment, one of which was [a] type of testimony that's being proposed here, which is testimony given under oath at a prior hearing at which the defendant was present with counsel with an opportunity to cross examine the witness on those issues that will be submitted on the testimony of the preliminary examination. So, number one, there is not a *Crawford* problem here. There is not a confrontation clause problem here. There is however, a hearsay problem.

Unless the witness is unavailable. Unavailable is set forth in [Rule] 804b1 or pardon me, 804a and specifically in this situation we would be dealing with subrule 5 which is the witness is absent from the hearing, which would be the trial and the proponent of the statement, the prosecutor, has been unable to secure the declarant, that would be Mr. Hiester's, attendance by process, which would be a subpoena or other reasonable means, and in a criminal case, which this is, due diligence is shown. Now, number one, I find that the prosecutor has been unable to procure Mr. Hiester's attendance through the use of process because he has served him with a subpoena and the witness has failed to respond to that subpoena. I further find that based on the effort to bring the witness here through surveillance of his premises, through contacting the people who know him best which is his girlfriend . . . . I consider that to be due diligence, therefore I declare the witness unavailable and under 804b1 this is former testimony given as a witness at another hearing and therefore this proposed testimony violates neither the hearsay prohibition nor does it violate the confrontation clause and therefore, it will be admissible.

(Id. at pp. 96-97.) The *Crawford* opinion concludes that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. . . . [and] it applies at a minimum to prior testimony at a preliminary hearing." *Crawford,* 541 U.S. at p. 68. The state court's resolution of the issue is neither contrary to nor an unreasonable application of *Crawford.*[9] Petitioner's Confrontation Clause challenge is without merit.

---

[9]The Sixth Circuit has recognized "'some question as to whether a preliminary hearing necessarily offers an adequate prior opportunity for cross-examination for Confrontation Clause purposes.'" *Williams v. Bauman*, 759 F.3d 630, 636 (6th Cir. 2014) (citing *Al-Timimi v. Jackson*, 379 F. App'x 435, 437 (6th Cir. 2010)). "[Because] there is room for reasonable debate on the issue the state court's decision to align itself with one side of the argument is necessarily

Petitioner attempts to distinguish the many cases permitting the introduction of preliminary examination testimony under circumstances similar to those presented here by noting that the prosecutor added a charge, the June 27, 2006 delivery of less than 50 grams of cocaine charge, after the preliminary examination. Petitioner contends that the absence of the charge at the time of the preliminary examination precluded his attorney from cross-examining Mr. Hiester with respect to that transaction. Although the specific delivery charge had not been added, the transaction wherein Petitioner contacted Mr. Hiester and instructed him to deliver a small amount of cocaine to Ms. Fitch who, in turn, delivered to Mr. Girard, was very specifically the subject of Mr. Hiester's preliminary examination testimony. (Prelim. Exam. Tr., ECF No. 10, p 7-10 ("Q: Did you deliver any of that to Tracy? A: Five ounces, plus a smaller amount earlier.")) Whether the delivery of the "smaller amount" is considered as a separate crime or as an act in furtherance of the criminal conspiracy, Petitioner's counsel had the same motivation to explore the testimony through cross-examination. The distinction offered by Petitioner does not warrant a different result.

###    F.    Jury questions

After deliberating for a little more than an hour, the jury requested three exhibits and posed two questions: (1) why was Hugo in jail without bail for two weeks; and (2) could he make bail. (Trial Tr. IV, ECF No. 19, p. 3.) The court answered the questions as follows:

> I'm going to refer you back to one of the instructions I gave you. One of those instructions was you may only consider the evidence that has been admitted in the case. I can't supply you information that has not been admitted in the case. There has been no evidence on Mr. Rodriguez being in jail without bail for two weeks and there's been no evidence about

---

beyond this court's power to remedy under § 2254, even if it turns out to be wrong." *Williams*, 759 F.3d at 636.

whether or not he could make bail so I can't answer those questions.  They're not in evidence.

(*Id*.)  Neither counsel objected to the court's response.  Petitioner, contends the failure to read back testimony for the jury violated his right to due process.  He provides no explanation as to how the court's instruction, that the jury consider only the evidence that has been admitted in the case, rendered his trial unfair.

The trial court rejected Petitioner's challenge as meritless.  (Op. and Ord., ECF No. 25, p. 7.)  The court noted that neither question asked for any testimony to be read back.  (*Id*.)  The court also determined that there was no evidence that the Defendant was in jail *without bail* or that he could not make *bail*.  (*Id*. (emphasis added))  There was simply no way to respond to the questions without presenting matters not in evidence.  (*Id*.)  The court's factual determinations are patently reasonable.  There was nothing in the record regarding bail.  And, as the trial court found, there is simply no merit to Petitioner's claim that he has been denied due process by an instruction that limits the jury to the evidence that has been admitted.

## G.    The cumulative effect of issues A-F

Meritless individual claims of error cannot by accumulation create constitutional infirmity. *See Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004) ( "[T]he accumulation of non-errors cannot collectively amount to a violation of due process.") (internal quotation omitted).

## H.    Ineffective assistance of appellate counsel

Petitioner contends his appellate counsel was ineffective for failing to raise issues A-G and for not raising an argument that the scoring of offense variable 19 was wrong on the facts.[10]

Where a claim lacks merit, appellate counsel is not ineffective in declining to raise the issue on direct appeal. *See Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. Feb. 26, 2013) ("[A] petitioner cannot show that appellate counsel was ineffective for failing to raise a claim on appeal if the underlying claim itself lacks merit."); *Burton v. Renico*, 391 F.3d 764, 781-82 (6th Cir. 2004) (where claim of prosecutorial misconduct lacks merit, counsel is not ineffective in declining to raise issue on appeal). As set forth above, Petitioner's issues A-G lack merit; therefore, appellate counsel's failure to raise them on direct appeal does not constitute ineffective assistance. That is the conclusion the trial court reached. (Op. and Ord., ECF No. 25, p. 6-7.) That conclusion is consistent with clearly established federal law and is premised on reasonable determinations of the facts.

The state court also concluded that Petitioner's OV 19 scoring issue was meritless. (*Id.*) Offense Variable 19 relates to threats to security or interference with the administration of justice:

> Score offense variable 19 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:
>
> (a) The offender by his or her conduct threatened the security of a penal institution or court
>                                                                                                25 points
>
> (b) The offender used force or the threat of force against another person or the property of another person to interfere with, attempt to interfere with, or that results in the interference with the administration of justice or the rendering of emergency services
>                                                                                                15 points

---

[10] Counsel raised an appellate argument that Petitioner's sentence was improper because several offense variables (including OV 19) were scored based on facts found by the judge, instead of the jury, and not found beyond a reasonable doubt. She did not, however, raise the argument that Petitioner raises now: that the trial court's scoring was factually unsupported.

(c) The offender otherwise interfered with or attempted to interfere with the administration of justice                                                         10 points

(d) The offender did not threaten the security of a penal institution or court or interfere with or attempt to interfere with the administration of justice or the rendering of emergency services by force or threat of force                  0 points

MICH. COMP. LAWS § 777.49.  The Michigan Supreme Court has concluded that providing false information to law enforcement personnel constitutes interference with the administration of justice and warrants the score of ten points on OV 19.  *People v. Barbee*, 681 N.W. 2d 348 (Mich. 2004).

Ms. Fitch testified that Petitioner had convinced her to lie regarding the level of Petitioner's involvement in the cocaine conspiracy.  (Trial Tr. III, ECF No. 18, pp. 48-79.)  At Petitioner's request, in communications with law enforcement and in letters to Petitioner, Ms. Fitch falsely represented that Mr. Hiester was the principal and that Petitioner was not involved.  (*Id*.)  The letters were admitted into evidence at Petitioner's trial.  (*Id*. at pp. 50, 72, 78.)

At sentencing, the court stated that Petitioner was clearly trying to influence Ms. Fitch's testimony so it scored ten points for OV 19.  (Sentencing Tr., ECF No. 20, p. 5.)  When it reconsidered the matter in connection with Petitioner's motion for relief from judgment, the trial court again reviewed the testimony of Ms. Fitch.  The court concluded that there was a preponderance of evidence supporting the determination that Petitioner had interfered with the administration of justice by attempting to convince Ms. Fitch to not testify or to testify untruthfully.  (Op. and Ord., ECF No. 5, pp. 6-7.)

The trial court's factual finding, at sentencing and on reconsideration, is presumed correct.  To rebut that presumption, Petitioner must present clear and convincing evidence.  He has failed to do so.  Accordingly, Petitioner's challenge to the scoring of OV 19 is without merit.  Appellate counsel is not

ineffective for failing to raise a meritless issue.  .  *See Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. Feb. 26, 2013) ("[A] petitioner cannot show that appellate counsel was ineffective for failing to raise a claim on appeal if the underlying claim itself lacks merit.");*Burton v. Renico*, 391 F.3d 764, 781-82 (6th Cir. 2004) (where claim of prosecutorial misconduct lacks merit, counsel is not ineffective in declining to raise issue on appeal).

## Conclusion

In light of the foregoing, the Court will deny Petitioner's application because it fails to raise a meritorious federal claim.

## <u>Certificate of Appealability</u>

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's denial of Petitioner's claims was debatable or wrong.  Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.


Dated:   September 8, 2016                     /s/ Paul L. Maloney
                                               Paul L. Maloney
                                               United States District Judge